**BLANK ROME LLP**
David M. Perry, Esquire
Leigh Ann Buziak, Esquire
Jared M. DeBona, Esquire
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Tel.: (215) 569-5500
Fax: (215) 569-5555
Email: Perry@blankrome.com
lbuziak@blankrome.com
DeBona@blankrome.com

*Attorneys for Plaintiff,*
*UBU/Elements, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UBU/ELEMENTS, INC., | : |
| Plaintiff, | : Case No.: 16-2559 |
| v. | : |
| ELEMENTS PERSONAL CARE, INC., *et al.* | : |
| Defendants. | : |

**PLAINTIFF UBU/ELEMENTS, INC.'S**
**PRE-HEARING STATEMENT OF THE CASE**

Plaintiff UBU/Elements, Inc. ("UBU/Elements") respectfully submits this Pre-Hearing Statement in support of its Motion for a Preliminary Injunction (Dkt. No. 3) and in advance of the preliminary injunction hearing set for July 28, 2016 (Dkt. No. 23) to highlight the key factual and legal bases that support the entry of a preliminary injunction against Defendants Elements Personal Care, Inc., Elements Personal Care, LLC (together, "EPCI"), and Warren Chambers ("Chambers") (collectively, "Defendants") enjoining them from using UBU/Elements' "After the Game" and "Magsoothium" trademarks (collectively, the "Marks"). This Statement is not

intended to be a complete brief on all of the issues in controversy and UBU/Elements intends to submit to the Court comprehensive proposed findings of fact and conclusions of law following the preliminary injunction hearing in accordance with Rules 65 and 52.

I. **THE AFTER THE GAME TRADEMARK WAS DULY ASSIGNED TO UBU/ELEMENTS PURSUANT TO THE ASSET PURCHASE AGREEMENT AND UBU/ELEMENTS IS THE RIGHTFUL OWNER OF AFTER THE GAME**

The evidence exchanged through expedited discovery shows that the Defendants assigned the "After the Game" trademark to UBU/Elements on November 23, 2011 when the parties all gathered together to sign and enter into the Asset Purchase Agreement ("APA") and the Shareholder Agreement to form a new entity, UBU/Elements, Inc. Once the assignment occurred, UBU/Elements owned the "After the Game" trademark and all rights, title, and interest in the "After the Game" trademark, regardless of whether such assignment was recorded in the United States Patent and Trademark Office ("USPTO") at the same time.

The express language of the APA,[1] other contemporaneous documents executed by Mr. Chambers himself <u>at that time</u>, and all parties' course of conduct following the APA support and confirm that the assignment occurred on November 23, 2011.

A. **The Express Language of the APA Provides that the Assignment Occurred at the Closing, Which the Evidence Shows Was Held on November 23, 2011**

In paragraph 1.1, entitled "Agreement to Sell," the parties agreed as follows:

> **At the Closing** (hereinafter defined), **the Seller [defined as EPCI] shall** sell grant, convey, transfer, **assign** and deliver to

---

[1] Mr. Chambers disputes the authenticity of the APA that UBU/Elements has submitted and its attorney Harry Skene has confirmed it is the complete and accurate version of the APA executed by the parties on November 23, 2011. As the Court noted in its temporary restraining order opinion (Dkt. No. 22 at n. 3) and as was confirmed through expedited discovery, the version Mr. Chambers has submitted as the "original" APA is not substantially different from the APA UBU/Elements submits is the actual APA. Accordingly, as the Court noted, the disagreement over the authenticity of the document is not material to this dispute in that both documents convey the "After the Game" trademark. For purposes of expedited discovery and for the purposes of the hearing, UBU/Elements will use the APA that Mr. Chambers admits in paragraph 24 of his affidavit is the document that he entered into on behalf of EPCI on November 23, 2011. (*See* Dkt. No. 12, Affidavit of Warren Chambers, ¶ 24, attaching a version of the APA as Exhibit "3").

>Purchaser [defined as UBU/Elements], upon the terms and subject to the conditions of this agreement, free and clear of all liens, encumbrances and charges, **all of the following**:
>
>>(a) All usable and saleable inventory owned by [EPCI] on the Closing Date (hereinafter defined);
>
>>(b) All furniture, fixtures, machinery and equipment owned by [EPCI] on the Closing Date, including without limitation those items specifically listed on Exhibit A attached hereto and incorporated herein (the "Fixed Assets"); and
>
>>(c) **All intellectual property registered or used by [EPCI] or its principal Warren Chambers**, which includes but is not limited to; patents, **trademarks**, copyrights and formulas for the following items:
>
>>>i.   **After the Game;**
>>>
>>>…

(emphasis added).  In paragraph 1.2 entitled "Agreement to Purchase," the parties agreed that:

>At the Closing, [UBU/Elements] shall purchase from [EPCI], upon the terms and subject to the conditions of this Agreement and in reliance of the representations and warranties of [EPCI] in this Agreement and the Exhibits hereto, the Assets to Be Acquired and, as consideration therefor, shall pay to [EPCI] as set forth in paragraph 2.1 the Purchase Price for the Assets.

(emphasis added).  Section 2.1, entitled "Purchase Price" then provides:

>The purchase price for the Assets shall be an interest in the new [UBU/Elements] entity based upon a percentage of stock and contribution of the parties in the form of Assets (described above) from [EPCI], cash and facilities from [UBU/Elements] and mutual work on the project from all parties involved.  Seller Chambers will receive 26% ownership, Seller Sumrall 5% in the new entity, while Purchaser Blau will receive 25%, Purchaser Koral will receive 25% while the entity retains 19% in treasury.

(emphasis added).  The APA provided for and described "The Closing: Transfer Procedures" in Section 3, the relevant provisions of which are as follows:

3

>    3.1  Closing.  The closing of the sale and purchase of the Assets (the "Closing") shall be held at 10:00 a.m., local time, on Tuesday 8 November 2011 (the "Closing Date") at 900 Rutter Ave, Forty Fort, Pennsylvania, **or on such other date and at such other time as the parties may agree in writing.**
>
>    3.2  Transfer of Assets.  At the Closing**,** [EPCI] shall deliver to [UBU/Elements] such bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, **in form and substance reasonably satisfactory to [UBU/Elements] counsel,** as shall be effective to vest in [UBU/Elements] all of [EPCI's] right, title and interest in and to the Assets.
>
>    3.3  Purchase Price.  At the Closing, [UBU/Elements] shall transfer shares of the new entity to [EPCI] and [EPCI] transfer Assets in accordance with Section 2.1 hereof.

Although the Closing did not occur on November 8, 2011 as set forth in the APA, the APA explicitly provided that the parties could agree to do the Closing another day.[2]  There is further no dispute in the record that UBU/Elements is a closely-held business where the shareholders saw each other and met on a regular basis before and after the execution of the APA.  Thus, the parties agreed and they, in fact, did meet together in the office of UBU/Elements' attorney, Harry Skene, for the signing and execution of the APA and the Shareholder Agreement.[3]  This was the "Closing" as that term is defined in the APA that effectuated the transfer of substantially all of Defendants' assets to UBU/Elements.  The APA is explicit that the only further instruments or documentation to support the transfer of EPCI's rights, title, and interest to the Assets – including "After the Game" – that needed to be supplied

---

[2] Although the APA states that a change in the Closing Date should be made in writing, there is no question that Pennsylvania law provides that a written contract may be modified orally notwithstanding a provision that all modifications must be in writing.  *Wagner v. Graziano Constr. Co.*, 136 A.2d 82 (Pa. 1957) (holding that "there is nothing sacrosanct about a written agreement…the most ironclad written contract can always be cut into by the acetylene torch of parol modification if supported by adequate proof…either by express agreement or actions necessarily involving the alterations….The hand that pens a writing may not gag the mouths of the assenting parties.")

[3] Dr. Sumrall, who lives in the Indianapolis area, was not physically present, but executed these same documents around the same date, and returned the signature page to Harry Skene by FedEx.

at the Closing were documents *reasonably satisfactory to the Purchaser* (here, UBU/Elements) that the Assets were being transferred.  Mr. Blau will testify that, from the Purchaser's perspective, the APA was a "reasonably satisfactory" instrument that conveyed all rights and title to the assets that were being transferred including "After the Game."  Thus, UBU/Elements was satisfied that the Assets were being transferred and assigned pursuant to the APA.  There is no other condition or provision or anything else that needed to be done to effectuate this transfer of rights under the contract or as a matter of law.

It is important to note, as this Court did in its opinion on the temporary restraining order, the fine legal distinction between an *assignment* of trademark rights on the one hand and the *recordation* of such assigned rights with the USPTO on the other.  As this Court noted, "the mere act of recording an assignment document is a ministerial act" that records an assignment "that appears on its face to be an assignment."  (Dkt. No. 22 at p. 3 *citing Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 63 (2d Cir. 2010)).  And, as the Federal Circuit has observed, the statutory framework of the Lanham Act provides that: (1) a patent or trademark assignment must be in writing; and (2) *the recording of the assignment is necessary only to protect the assignee from subsequent bona fide purchasers without notice*.  See *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 777 (Fed. Cir. 1996) (emphasis added).

That is exactly what happened here.  Here, there can be no dispute that the parties agreement to meet in UBU/Elements' attorney's office to execute the APA and the Shareholders Agreement *was* the Closing that effectuated the transfer and assignment of all rights, title, and ownership in "After the Game" to UBU/Elements.  It was not until *nearly five years later*, after working for years under the terms of these agreements, that Mr. Chambers contested the ownership of the "After the Game" trademark.  After attempting to resolve these issues with Mr.

5

Chambers, UBU/Elements proceeded to ensure that the assignment was recorded with the USPTO to protect UBU/Elements as the proper assignee of these rights.

### B. Other Documents Executed and Verified by Mr. Chambers At the Time of the APA Confirm that After the Game Was Assigned to UBU/Elements on November 23, 2011

In addition to the APA itself, it is undisputed that Mr. Chambers certified and signed other documents that confirm the transfer of Defendants' assets, including After the Game, on November 23, 2011.

First, the UBU/Elements' Shareholder Agreement, which established the ownership interests that served as consideration for the APA, was entered into on November 23, 2011. This occurred in accordance with Section 3.3 of the APA, which provided that "At the Closing, the Purchaser shall transfer shares of the new entity to the Seller. . . ." Thus, the fact that the Shareholder Agreement was entered into on that same date and shares were transferred to Defendants pursuant to the APA is further evidence that the APA closed on November 23, 2011 and the assets, including After the Game, were transferred and assigned as of that date.

Second, Mr. Chambers testified at this deposition that he signed and certified an "Application for Tax Clearance Certificate" filed with the Pennsylvania Department of Revenue, which shows that the transfer of Defendants' assets was completed on November 23, 2011. The document asks: "Will the assets or activities of the business be transferred to another?" The box was checked "Yes" in response, and noted that the assets would be transferred to "UBU/Elements, Inc. 900 Rutter Ave, Forty Fort PA 18704." In another section, it was noted that the purposes of filing the application was to obtain a "Bulk Sale Clearance Certificate under Section 1403 of the Fiscal Code." Importantly, the "Sale date" in this section is noted as

6

"11/23/2011." Mr. Chambers signed and certified that "the information provided. . . on this application has been examined by me and is, to the best of my knowledge, true and correct."

Third, Mr. Chambers also testified at his deposition that he received a Clearance Certificate from the Department of Labor & Industry, which reflected that EPCI filed all reports due and fully paid into the unemployment compensation fund "all contributions, interest and penalties due to <u>November 23, 2011, this being the date of the proposed transfer in bulk of the assets of the above</u> [referencing EPCI], as required by Section 308.3 of the Pennsylvania Unemployment Compensation Law" (emphasis added).

Finally, Mr. Chambers confirmed in his deposition that EPCI held a Special Meeting of the Shareholders of Elements Personal Care, Inc., which is reflected in contemporaneous minutes of the meeting. In those Special Meeting Minutes dated November 12, 2011, there was a "unanimous vote of Warren Chambers and Arthur Sumrall" that the parties "should sign an Asset Purchase Agreement and sell the Assets of the Corporation to a new entity UBU/Elements, Inc." The minutes further reflect that "the shareholders, directors and officers believe that it is in the best interest to convey the assets of the Corporation to the New Corporation and continue operations under that entity."

Thus, the contemporaneous documents that Mr. Chambers certified and agreed to at the time confirm that UBU/Elements was acquiring substantially all of Defendants' assets, including the After the Game trademark, on November 23, 2011 pursuant to the APA.

    **C.**    **The Parties Course of Conduct Confirms that the APA Assigned UBU/Elements the Rights to After the Game**

In addition to the express language of the APA and the contemporaneous documents reflecting that the APA assigned UBU/Elements all rights to the "After the Game" trademark,

the parties' course of conduct is further evidence that "After the Game" was transferred to UBU/Elements on November 23, 2011.

The following facts are not disputed in the record UBU/Elements will submit to the Court:

- UBU/Elements purchased the domain names www.afterthegame.com and www.magsoothium.com and funded the design and maintenance of these websites;

- UBU/Elements, with the consent and agreement of Mr. Chambers, entered into an Acquisition and Licensing Agreement with a third party in which all of the UBU/Elements shareholders, including Mr. Chambers, confirmed that UBU/Elements owned all of its trademarks, including After the Game;

- UBU/Elements had business cards made for Mr. Chambers, Mr. Blau, and Mr. Koral bearing both the After the Game and Magsoothium trademarks for their use in promoting and marketing these brands, which Mr. Chambers knew about and agreed with;

- Mr. Chambers himself held himself out as a representative of UBU/Elements to sell both Magsoothium and After the Game;

- UBU/Elements reimbursed Mr. Chambers for his business expenses for the promotion of After the Game and Magsoothium; and

- UBU/Elements invested a significant amount – in excess of $200,000 – in the promotion, marketing, sales, packaging, manufacturing, and labeling of both After the Game and Magsoothium all with Mr. Chambers's knowledge.

Thus, the parties' course of conduct, including UBU/Elements' investment in the After the Game trademark and Mr. Chambers's direct acknowledgment and assent to the same demonstrates that the After the Game mark was assigned at the closing of the APA on November 23, 2011.

### D. Even if the Court Does Not Conclude – Against the Weight of the Evidence – that the APA Was an Assignment of After the Game, Case Law Establishes that an Assignment, in fact, Occurred in these Circumstances

#### 1. An Assignment Occurred Because Defendants Transferred Substantially All of Their Assets to UBU/Elements

Even if the Court finds that the APA was not an assignment of After the Game to UBU/Elements – a difficult conclusion to reach in light of the evidence – the facts outlined above show that After the Game was automatically transferred because UBU/Elements acquired substantially all of the assets of Defendants. "Where a business as a whole is transferred without mentioning the transfer of the [trade]mark, it is presumed that the mark and good will associated with that mark are transferred as well." *Burgess v. Gilman*, 475 F. Supp. 2d 1051, 1055 (D. Nev. 2007); *see also* Memorandum Opinion on TRO (Dkt. No. 22 at n. 4) *citing Am. Mfg. Co., Inc.* 192 U.S.P.Q. ¶ 498 (P.T.O. Aug. 31, 1976) ("a merger of one corporation into another effects a transfer of the marks owned by the acquired corporation, even without a formal assignment.")

In this regard, *First Fashion USA, Inc. v. Best Hair Replacement Manufacturers, Inc.* 645 F. Supp. 2d 1158 (S.D. Fla. 2009) presents a strikingly similar set of facts, although there, the parties did not enter into *any* writings reflecting their intention to assign or transfer the trademarks at issue. In *First Fashion*, the defendant infringer owned a hair-replacement company that owned the trademark at issue. *Id.* at 1160. The defendant's company experienced financial problems, so defendant approached plaintiffs proposing that they set up a new company using the assets – including the trademark – of defendant's old company, just as EPCI and Mr. Chambers approached Mr. Koral and Mr. Blau about forming UBU/Elements, Inc. *Id.* at 1160-61. The *only* document reflecting the agreement between the parties in *First Fashion* were Articles of Incorporation forming the new company. *Id.* at 1161. The defendant, who had been working for the new company, was terminated because he mismanaged the new company's

9

finances. *Id.* at 1162. After the falling out – just like in this case – the defendant continued to operate his old company and resumed using the trademark. *Id.* at 1162-63. The plaintiff filed suit seeking to enjoin the defendant from using the trademark.

The district court granted the preliminary injunction holding that the defendant conveyed the old company to the new company, including the trademark. *Id.* at 1164-66. The district court's conclusion was based on "the objective facts" that the plaintiffs "made significant contributions of capital" to the new company in exchange for their shares in the new company whereas the defendant obtained his shares in the new company through "the contribution of his [old] business." *Id.* at 1164-65. The district court further concluded that "[t]he law presumes that when a business is conveyed, its trade name and good will is also conveyed" and that defendant "did not do anything to rebut this presumption." *Id.* at 1164-65. Thus, the district court held that the defendant transferred his business and its associated trademarks, ***despite the fact*** that there was no written agreement reflecting that the parties intended to transfer assets, let alone transfer the trademark.

Here, the facts are much stronger than in *First Fashion* and therefore certainly compel the same result. Here, just like *First Fashion*, the defendant approached the plaintiff about investing in a new company to be formed out of the assets of the old company, which included a trademark, and here, the parties actually entered into an Asset Purchase Agreement reflecting that agreement, as well as a Shareholder Agreement. Indeed, Defendants transferred all of their (1) usable and saleable inventory; (2) furniture, fixtures, machinery and equipment, and (3) all intellectual property, and certified to the Commonwealth of Pennsylvania that they were transferring the activities and assets of the business to UBU/Elements. Further, at the time of the asset transfer – and up until the Parties' falling out – Defendants never represented to

10

UBU/Elements that they were reserving their ownership rights over the Marks. Here, as in *First Fashion*, a falling out between the parties resulted in the defendant simply resuming the use of the trademark that had been transferred to the new company. The result of *First Fashion* was that the former owner of the trademark was enjoined from continuing to use the mark in which the plaintiff had duly invested and now owned. The Court should reach the same result here – on a much stronger evidentiary basis – and enjoin Defendants from using After the Game.

### 2. Alternatively, It is Clear that After the Game Was Transferred Through an Implied Agreement Between the Parties

The Third Circuit has held that "[e]ven if a writing is lacking[,] an assignment [of a trademark] may be proven in other ways," including through the "clear an uncontradicted oral testimony of a person in a position to have actual knowledge." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (2006); *see also TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997) ("Assignments of trademark rights do not have to be in writing, but an 'implied agreement to transfer' requires conduct manifesting agreement, not just conduct that might be characterized as being shady or otherwise inequitable."). Further, under Pennsylvania law, "an implied contract arises when parties agree on the obligation to be incurred, but their intention . . . is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015).

Here, though Mr. Chambers is now contesting ownership of the After the Game trademark on the surface, the admissions he has made in the record, including his deposition testimony, establish the opposite: that he meant and intended to transfer the trademarks to obtain an investment in a new company that would carry on the work of his old one and acted in conformance with this agreement for years before raising any issue. The record evidence will

11

establish – based on his own admissions – that the assignment occurred through an implied contract.

**II. THERE IS NO DISPUTE THAT UBU/ELEMENTS OWNS THE MAGSOOTHIUM TRADEMARK AND THAT DEFENDANTS HAVE BEEN INFRINGING AND UNLAWFULLY INTERFERING WITH UBU/ELEMENTS' BUSINESS**

At the hearing on the temporary restraining order, Mr. Chambers admitted that UBU/Elements has the right to trade under the name Magsoothium, that he has no right as an individual to sell Magsoothium even though UBU/Elements has that right and he is an owner of UBU/Elements, and Mr. Chambers agreed that he is not to – in any respect – deal under the Magsoothium trademark.

These admissions were clear and unequivocal on the record before the Court. At that time, UBU/Elements presented evidence that Mr. Chambers was, in fact, selling Magsoothium in the marketplace and that such sales were causing confusion amongst UBU/Elements' customers. The evidence Defendants produced in discovery completely contradicts Mr. Chambers's representation to the Court that he has not sold Magsoothium. In fact, a multitude of invoices, which UBU/Elements will present at the hearing, establish that Mr. Chambers has been infringing the Magsoothium mark for years without UBU/Elements' knowledge or consent.

**III. DEFENDANTS' CONDUCT IS CAUSING CUSTOMER CONFUSION IN THE MARKETPLACE, RESULTING IN IRREPARABLE HARM TO UBU/ELEMENTS**

UBU/Elements already established at the temporary restraining order hearing that Defendants' conduct was causing confusion in the marketplace and, as a result, irreparable harm. UBU/Elements stands by and will amplify this showing at the preliminary injunction hearing with further specific examples of customer confusion and damage to UBU/Elements.

## IV.  OTHER ISSUES FROM EXPEDITED DISCOVERY

On July 13, 2016, UBU/Elements sent Defendants' counsel a letter outlining the significant deficiencies with Defendants' discovery responses.  UBU/Elements specifically followed up with an email specifically identifying the document Mr. Chambers testified he kept that kept tracked of his sales and which he represented to the Court he would produce.  To date, UBU/Elements has not received any response to the letter or the request for this document and is being forced to proceed on an expedited basis in the absence of complete responses to discovery.  Based on the evidence uncovered so far, further discovery will likely only support and bolster UBU/Elements' on the matters in dispute.

## V.  CONCLUSION

Based on the foregoing, and the evidence that will be presented at the June 28, 2016 preliminary injunction hearing, UBU/Elements respectfully requests the Court preliminarily enjoin Defendants from using the Marks.

Respectfully submitted,

**BLANK ROME LLP**

Dated:  July 26, 2016

David M. Perry, Esquire
Leigh Ann Buziak, Esquire
Jared M. DeBona, Esquire
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
Tel.:  (215) 569-5500
Fax:  (215) 569-5555
Email:  Perry@blankrome.com
   lbuziak@blankrome.com
   DeBona@blankrome.com

*Attorneys for Plaintiff,
UBU/Elements, Inc.*

13

**CERTIFICATE OF SERVICE**

I, Leigh Ann Buziak, Esquire, hereby certify that, on this 26th day of July, 2016, I caused to be served a true and correct copy of the foregoing upon the following:

Terry R. Clayton
Terry Clayton & Associates, P.C.
1402 Fifth Avenue North
Nashville, TN 37208
*Attorney for Defendants*
(*via* E-mail and Federal Express)

_____
LEIGH ANN BUZIAK