UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UBU/ELEMENTS, INC., | : |
| Plaintiff, | : Case No.: 16-2559 |
| v. | : |
| ELEMENTS PERSONAL CARE, INC., *et al*. | : |
| Defendants. | : |

**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS'
PRELIMINARY INJUNCTION HEARING MEMORANDUM**

Plaintiff UBU/Elements, Inc. ("UBU/Elements") is constrained to submit this short brief to correct and clarify what are the actual facts in the record and incorrect legal arguments made by Defendants Element Personal Care, Inc., Elements Personal Care, LLC (together "EPCI"), and Warren Chambers ("Chambers") (collectively, "Defendants") in their Preliminary Injunction Hearing Memorandum (the "Memorandum").

    1.    <u>The Agreement to Permit Mr. Chambers to Continue to Use "After the Game" to Satisfy Obligations to Existing Customers Was an Implied License and Does Not Affect UBU/Elements Ownership of "After the Game."</u>

Alan Blau testified at the preliminary injunction hearing that UBU/Elements agreed to allow Mr. Chambers to continue to sell products to EPCI's existing customers, but that all new customers and new business generated after the parties formed UBU/Elements would be part of the new business, with profits shared amongst the partners as set forth in the company's Shareholders Agreement. This understanding is memorialized in paragraph 4.7(c) of the Asset Purchase Agreement ("APA") whereby Mr. Chambers represented that he had no other existing obligations or agreements *except* for After the Game. That makes sense; because he was selling substantially all of the assets of his business, Mr. Chambers was obligated to disclose what, if

any, ongoing obligations he had prior to entering into the APA.  In paragraph 4.7(c), Mr. Chambers disclosed that he had existing obligations to sell After the Game ("ATG"), which the parties agreed he was permitted to fulfill.  In their Memorandum, Defendants state that both Mr. Blau and Chambers testified "that they understood Section 4.7 of the APA to mean Mr. Chambers could continue to produce and sell his haircare products and ATG at the Forty Fort facility."[1]  (Dkt. Entry 34 at 3.)  That is not entirely accurate.  The agreement was that Mr. Chambers could fulfill existing obligations but that revenue from new customers was to come into the company.  The permission to allow Mr. Chambers to do this amounts to an implied license for a limited purpose, and does not affect UBU/Elements's ownership rights in the trademark.  *See Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000) ("Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made.").

    2.    <u>Defendants Did Not Introduce Evidence Concerning Any Alleged Harm They Might Suffer If the Preliminary Injunction Is Issued.</u>

Defendants only now, in their post-hearing Memorandum, attempt to introduce evidence concerning potential harm that might occur to Mr. Chambers if the Court issues a preliminary injunction.  Defendants failed to provide <u>any</u> evidence during discovery or at the hearing, and UBU/Elements highlighted this exact point during closing arguments.  Defendants cannot now, after all of the evidence has been submitted, attempt to insert this critical element into these

---

[1] There is nothing in the record to support Defendants' contention that Mr. Chambers was permitted to continue to sell product without any limitations.  To the contrary, the testimony of Alan Blau establishes that Mr. Chambers was only permitted to create product for EPCI's existing ATG customers.  If Section 4.7 authorized Defendants to continue to sell product to new customers (which it does not), then UBU/Elements would essentially be agreeing to provide a <u>competitor</u> with a facility and resources <u>to continue to compete against UBU/Elements</u>.  This interpretation of Section 4.7 is untenable.

proceedings. The simple fact is that there is absolutely no record evidence of any harm to Mr. Chambers as a result of enforcing UBU/Elements rights to "After the Game."

       3.      <u>The APA Covered All Intellectual Property Owned by EPCI **or Its Principal Warren Chambers.**</u>

Section 1.1(c) of the Asset Purchase Agreement ("APA") states that EPCI will assign "[a]ll intellectual property registered or used by the Seller or its <u>principal Warren Chambers.</u>" (Pl.'s Ex. 5 (emphasis added).) The language of the APA is clear: UBU/Elements was assigned "all intellectual property" used by EPCI and Mr. Chambers. Mr. Chambers, who is admittedly EPCI's principal, cannot attempt to hide behind corporate formalities when the plain language of the APA clearly covered all intellectual property owned by Mr. Chambers as well as his closely-held business, EPCI.

       4.      <u>UBU/Elements Was Not Required To Register the Mark Within Three Months of Its Assignment</u>

Section 1060(a)(4) provides that "[a]n assignment shall be void against any <u>subsequent purchaser</u> for valuable consideration <u>without notice</u>, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within 3 months after the date of the assignment <u>or prior to the subsequent purchase.</u>" 15 U.S.C. § 1060(a)(4) (emphasis added). Thus, in order for Section 1060(a)(4) to apply there must be both a third-party subsequent purchaser and that subsequent purchaser must not have notice of the previous assignment. *See Teter, Inc. v. Rheem Mfg. Co.*, 334 F.2d 784, 786-87 (7th Cir. 1964) (affirming lower court decision that held "[t]here [is] no legal requirement for [assignee] to record its assignment . . . except as to be protected against a subsequent bona fide purchaser"); 3 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 18:11 (4th ed. 2016) ("Federal recordation of an assignment is permissive, not mandatory. There is no requirement to record except as to be protected against a subsequent bona fide purchaser."). Defendants'

3

reliance on Section 1060(a)(4) to advance the argument that the assignment was not effective is untenable.

Here, there is no third party claiming a superior right to the "After the Game" trademark. Defendants assigned the trademark in exchange for an ownership interest in UBU/Elements. Because Defendants are not third parties to the assignment of the trademark, they cannot claim that they are "subsequent purchaser[s] for valuable consideration without notice." *Id.* They are neither "subsequent purchasers", nor were they "without notice" that the "After the Game" trademark was assigned to UBU/Elements.

     5.     <u>The Closing Occurred on November 23, 2011 When the APA Was Signed by the Parties.</u>

The Closing contemplated by the APA took place on November 23, 2011 at the signing of the APA and the Shareholders Agreement. The following objective evidence demonstrates that the Closing occurred, and the "After the Game" mark was assigned on November 23, 2016: (1) the Parties purposefully met together in the offices of UBU/Elements's counsel to sign the APA and the Shareholders Agreement to memorialize the business relationship between and among them; (2) the Shareholders Agreement that established the ownership interests that served as the consideration for the APA was signed at the same time; (3) Mr. Chambers signed an "Application for Tax Clearance Certificate" stating that on November 23, 2011—the day the APA was signed—the "assets or activities" of EPCI were transferred to UBU/Elements, and Mr. Chambers later received a "Clearance Certificate" confirming that "all contributions, interest and penalties" connected with the November 23, 2011 bulk transfer were paid; and (4) the minutes taken at the Special Meeting of the Shareholders of Elements Personal Care, Inc. conducted on November 12, 2011 confirm that Mr. Chambers voted to transfer all of EPCI's assets to UBU/Elements.

In the face of this evidence, Defendants argue only that the Closing is mentioned in the APA fifteen times and that UBU/Elements' argument that the Closing occurred is somehow an attempt to read these references out of the APA. It is not. On the contrary, UBU/Elements has shown that the Closing did, in fact, occur on November 23, 2011 when the parties gathered to sign the agreements. Moreover, Defendants have no response to the fact that the APA is a fully integrated agreement, in that it specifically provides in paragraph 10.8 that it is the entire agreement between the parties. There are no other conditions, including any condition to sign an operational agreement or to provide a salary, that are contained in the APA and needed to be satisfied. Other than simply saying so, Defendants have presented no evidence – testimonial or documentary – to show that the Closing did not occur.

Finally, Defendants half-heartedly attempt to argue that the term "Closing" is ambiguous, though they do not explain the different meanings or interpretations that render it ambiguous. As Defendants admit, the term "Closing" is mentioned fifteen times in the APA. Given all of the conditions set forth in the APA and the number of times that the "Closing" is mentioned, there can be no doubt about what was supposed to occur prior to and at the Closing. All of the conditions were met and this was accomplished – including that the intellectual property and other assets were transferred, cash and facilities were provided, and shares of ownership in the new entity were transferred – on November 23, 2011 <u>at the Closing</u>. Defendants' claim that a Closing never occurred should be seen for what it is: an after-the-fact attempt to undo an agreement that they clearly entered into and abided by for years.

      6.    <u>An Assignment Occurred Because EPCI Transferred Substantially All of Its Assets to UBU/Elements.</u>

*First Fashion USA, Inc. v. Best Hair Replacement Manufacturers, Inc.*, 645 F. Supp. 2d 1158 (S.D. Fla. 2009) stands for the proposition that where, as here, substantially all of the assets

of a business are conveyed, its trademarks and goodwill are also conveyed regardless of whether there is a writing evincing an intention to assign the trademarks. On that basis, the court held that the plaintiff owned the marked and entered a preliminary injunction. Defendants' attempts to distinguish *First Fashion* are unpersuasive because they are focused on <u>irrelevant</u> distinctions that do not show why the Court should reach a different result. The only <u>relevant</u> differences between *First Fashion* and the current case <u>further support</u> UBU/Elements' claim that the "After the Game" trademark was assigned when EPCI transferred substantially all of its assets to UBU/Elements. Specifically, in *First Fashion*, there was <u>no writing</u> showing that trademarks and other assets from the old company were transferred to the new company. Yet the district court still held that based on the objective facts, the defendant transferred the old company (and its trademarks) to the new company in exchange for an ownership interest in the new company. *Id.* at 1164-66. Here, Mr. Chambers transferred substantially all of EPCI's assets (including its trademarks) to UBU/Elements in exchange for an ownership interest in UBU/Elements. UBU/Elements's position is stronger than the plaintiffs' in *First Fashion* because, unlike the plaintiffs in *First Fashion*, the Parties created a written agreement—the APA—which clearly lays out the Parties' intent to transfer EPCI's assets—including the "After the Game" trademark—to UBU/Elements. There are no material distinguishing features between the facts of *First Fashion* and this case that compel a different result.

      7.    <u>All Contemporaneously Created Documents Confirm that After the Game Was Transferred to UBU/Elements.</u>

The Third Circuit has held that "[e]ven if a writing is lacking[,] an assignment [of a trademark] may be proven in other ways," including through the "clear and uncontradicted oral testimony of a person in a position to have actual knowledge." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (2006). As explained during closing arguments, the present case

does not necessarily fit squarely under the *Doebler* analysis because here, there <u>is</u> a writing.[2] The rationale of *Doebler*, however, is helpful here because both the writing <u>and</u> the post-APA conduct of the parties confirms that the assignment took place.  This is consistent with black-letter contract law that permits the courts to look at the conduct of the parties when determining the meaning and import of contractual terms.  *See Philips Elecs. & Pharm. Indus. Corp. v. Leavens*, 421 F.2d 39, 45 (3d Cir. 1970) ("A well recognized principle of contract law requires that the terms of a contract be interpreted in light of the meaning which the parties themselves have attached to them as evidenced by their subsequent conduct.").

Here, the objective evidence all points to one outcome:  Mr. Chambers and EPCI assigned the "After the Game" trademark to UBU/Elements.  In addition to the contemporaneous evidence described above that demonstrates the Closing occurred on November 23, 2011, the parties conduct after the Closing confirms what was memorialized in the writing:

- Mr. Chambers made product for and helped UBU/Elements in its sales efforts for After the Game;

- Mr. Chambers helped develop sales leads for NFL teams for UBU/Elements to sell After the Game;

- Mr. Chambers attended trade shows and helped prepare UBU/Elements for the trade shows to sell After the Game;

- Mr. Chambers held himself out as UBU/Elements Director of Research and Development and had a UBU/Elements After the Game and Magsoothium business cards (and he did not object that his other partners had those business cards);

- Mr. Chambers knew and was aware that UBU/Elements purchased, built and maintained the websites www.afterthegame.com, www.afterthegamesports.com, and www.magsoothium.com;

- Mr. Chambers represented to a third party, MGS04, that UBU/Elements owned all of its trademarks, including After the Game.

---

[2] In addition, as the Court pointed out, it seems that *Doebler's* may only apply to common law trademark rights as opposed to federally registered trademarks because the Lanham Act requires that assignments be in writing.  15 U.S.C. § 1060(a)(3).

147891.00601/103260978v.2

In their Memorandum, Defendants have no response to all of this conduct or an explanation of why Mr. Chambers acceded for so many years as if UBU/Elements owned After the Game. Mr. Chambers cannot now rely on his own self-serving and inconsistent testimony to negate the overwhelming amount of evidence that shows that he and EPCI assigned the "After the Game" trademark.

8. <u>Defendants Have Not Controverted Plaintiff's Showing of Irreparable Harm</u>

UBU/Elements has shown through the testimony of Alan Blau that Defendants' unauthorized use of the "After the Game" trademark has caused considerable confusion within the market. UBU/Elements has already been contacted by customers who believe that UBU/Elements and Defendants are the same entity. Further, Defendants are using labels that do not comply with FDA standards that make claims that are misleading, if not false. Moreover, UBU/Elements has no control over how Defendants are making the product or the contents of the product <u>and</u> the evidence shows that UBU/Elements had to change the formula in order to avoid the presence of bacteria in the product. Defendants' conduct is thus causing irreparable harm to UBU/Elements because it has no control over the quality of the goods being represented under its marks in commerce or the way that they are labeled. Instead of attempting to rebut Mr. Blau's testimony, Defendants, for some reason, criticize UBU/Elements's accounting practices, which have no bearing on whether Defendants' use of After the Game is causing confusion in the market. In short, Defendants have not (and cannot) produced anything to controvert the testimony of Mr. Blau on this point. There is no question that UBU/Elements has satisfied the irreparable harm requirement and, in the absence of any evidence of harm to Defendants, justifies the entry of a preliminary injunction. *See MarbleLife, Inc. v. Stone Resources, Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) ("Given the likelihood of confusion by consumers caused by [Defendant], [Plaintiff] has suffered and continues to suffer irreparable harm.").

9. <u>Defendants Concede that a Preliminary Injunction as to Magsoothium is Justified.</u>

Defendants do not respond, because there is no response, to the overwhelming evidence regarding Magsoothium. There is no question that UBU/Elements owns that trademark and the evidence clearly establishes that Defendants have infringed it.

                                                            Respectfully submitted,

                                                            **BLANK ROME LLP**

Dated: August 4, 2016                     <u>/s/ Leigh Ann Buziak</u>
                                                      David M. Perry, Esquire
                                                        Leigh Ann Buziak, Esquire
                                                        Jared M. DeBona, Esquire
                                                        One Logan Square
                                                        130 N. 18th Street
                                                        Philadelphia, PA  19103

                                                        *Attorneys for Plaintiff,*
                                                        *UBU/Elements, Inc.*

CERTIFICATE OF SERVICE

I, Leigh Ann Buziak, Esquire, hereby certify that, on this 4th day of August, 2016, I caused to be served a true and correct copy of the foregoing upon the following:

Terry R. Clayton
Terry Clayton & Associates, P.C.
1402 Fifth Avenue North
Nashville, TN 37208
*Attorney for Defendants*
(*via* E-mail and Federal Express)

_____
LEIGH ANN BUZIAK

147891.00601/103260978v.2