IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UBU/Elements, Inc., : | | |
| Plaintiff, : | | CIVIL ACTION |
| : | | |
| v. : | | No. 16-2559 |
| : | | |
| Elements Personal Care, Inc., *et al.*, : | | |
| Defendants. : | | |

MCHUGH, J.                                                                                               AUGUST 19, 2016

### MEMORANDUM

This is an action for breach of trademark in which Plaintiff UBU/Elements, Inc. contends that it has exclusive rights to two trademarks for topical anti-inflammatory products.  It seeks a preliminary injunction preventing Defendants Elements Personal Care, Inc., Elements Personal Care, LLC (collectively "Elements Personal Care"), and Warren Chambers from trading under both marks.

In brief, Plaintiff alleges that it purchased from Chambers and his company the formulas and inventory necessary to make certain magnesium-based products, as well as the right to sell them under the name "After the Game" ("ATG").  After the purchase, Defendant Chambers continued to work with Plaintiff to develop and sell these products under the ATG name, as well as the name "Magsoothium."  However, Plaintiff alleges that it recently discovered that Defendants have been using these marks to sell their own version of magnesium-based products without Plaintiff's authorization.

At an earlier hearing on June 7, 2016, Defendant Chambers conceded that he lacked any right to market the product known as Magthoosium, but he contended that he continued to own the rights to the ATG trademark.  At the conclusion of that hearing, with the understanding that

1

Mr. Chambers was not marketing and would not market Magsoothium, I restrained his use of that mark. I declined, however, to enter a Temporary Restraining Order as to the ATG mark because I found that there were multiple issues of fact that needed to be resolved as to whether Defendants did in fact assign the ATG mark to Plaintiff in a legally enforceable way. Having granted the parties the right to conduct discovery on an expedited basis, and having taken further testimony and reviewed the submissions of the parties, I conclude that Plaintiff has established a likelihood of success on the merits of its trademark infringement claim as to both marks, as well as irreparable harm, and as a result a preliminary injunction will be issued.

### I. Standard of Review

Plaintiff's central claim alleges violations of the Lanham Act, specifically 15 U.S.C. § 1114, which prohibits infringement of a federally registered trademark. The Lanham Act authorizes courts to grant injunctions to prevent violations of trademarks protected by the Act. 15 U.S.C. § 1116. A preliminary injunction to restrain conduct is only appropriate in limited circumstances, however, and the movant must prove that: (1) it is likely to succeed on the merits of the underlying claim, (2) it will likely suffer irreparable harm if relief is denied, (3) granting relief will not result in greater harm to the nonmoving party, and (4) on balance, the public interest favors an injunction. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

### II. Likelihood of Success on the Merits of the Trademark Infringement Claim

To prevail on the merits of the trademark infringement claim, Plaintiff must prove that it owns the marks at issue, and that Defendants are engaging in unauthorized use of the marks that is likely to create confusion in the marketplace. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

### A. *What Constitutes a Valid Assignment of a Trademark*

The critical legal issue at the heart of this dispute is whether Plaintiffs did in fact acquire ownership of the ATG mark by way of an assignment from Defendants, which requires me to address the question of what is necessary to effectuate an assignment of a trademark. I previously ruled that Plaintiff's registration of the mark with the United States Patent and Trademark Office was not conclusive evidence as a matter of law that it owns the marks, and it would need to prove that it obtained ownership through the execution of a valid written assignment. June 22, 2016 Opinion at 4.

Although Plaintiffs contend that a written assignment is not *always* required, I am not persuaded that such a view is correct. On its face, Section 10 of the Lanham Act explicitly provides that an assignment of a federally registered mark must be in writing. 15 U.S.C. § 1060. In support of its position, Plaintiff relies principally upon *Doebler's Pa. Hybrids Inc. v. Doebler,* 442 F.3d 812 (2006), a case that encompassed a variety of claims, including both federal and common law trademarks. At one point in its opinion, the Court of Appeals stated that "even if a writing is lacking, an assignment may be proven in other ways." *Id.* at 822. Plaintiff seizes upon this language as support for its position here, but I think it unlikely that the Court of Appeals made this statement in connection with the Lanham Act, the language of which is expressly to the contrary. The authority cited by the Third Circuit in support of this statement was a treatise, *McCarthy on Trademarks and Unfair Competition* § 18:4 (4th ed. 2005), and a review of that treatise makes clear that the authors were describing the law governing common law trademark rights. That same treatise goes on to confirm that a writing *is* essential under the Lanham Act, which is hardly surprising because the statute itself is unambiguous and creates no exceptions to

the requirement.[1] Accordingly, I proceed with the assumption that written confirmation of an assignment is necessary to prove ownership of a federally protected trademark. There is, however, nothing in the Lanham Act addressing the requirements for such an assignment, nor any helpful case law that sheds light upon what constitutes a sufficient writing.

### B. *Sufficiency of Written Documents to Establish Assignment*

In my prior Opinion, I expressed concern that Plaintiff may only be able to demonstrate that Defendants *intended* to assign the ATG mark. However, Plaintiff has now presented sufficient additional written documentary evidence that this assignment was actually consummated.

Two documents are at the center of this dispute. One is an Asset Purchase Agreement ("APA"), and the other is a Shareholder Agreement. In the APA, Defendant Chambers, signing on behalf of Defendant Elements Personal Care, Inc., agreed that at a "Closing" he would "sell, grant, convey, transfer, assign and deliver to the Purchaser [Plaintiff] … all of the following: … All intellectual property registered or used by the Seller [Elements Personal Care, Inc.] or its principal Warren Chambers, which includes but is not limited to: patents, trademarks, copyrights and formulas for the following items: i) After the Game." Ex. P–5 at ¶ 1.1.[2]

In return for such assignment, the parties agreed to enter into a shareholder agreement, under which Warren Chambers would become a twenty-six percent shareholder in a new entity known as UBU/Elements, Inc., and the other shareholder in Elements Personal Care, Inc., Arthur

---

[1] It bears mention that *Dobler* cited a Seventh Circuit case, *T.M.T. North America, Inc. v. Magic Touch GMBH*, 124 F.3d 876, 884 (7th Cir. 1997), which held that in the absence of a writing, "strong evidence" would be necessary to establish an assignment. I am forced to conclude that *T.M.T. North America* was wrongly decided, because it dealt solely with the Lanham Act, and the only authority cited was once again *McCarthy on Trademarks and Unfair Competition.* Putting to one side the fact that a treatise cannot trump a statute, the Court erroneously cited the portion that discussed common law trademarks, rather than federally registered ones.

[2] As discussed below, Defendants dispute the validity of this agreement, but since Defendant Chambers concedes that he signed some form of a contract containing this quoted language, such a dispute is immaterial.

4

Sumrall, would become a five percent owner. The purchasers, which included Alan Blau and David Koral, were obligated to contribute cash and facilities.

The record is clear that the APA was signed by all of the interested parties, and the Shareholder Agreement was simultaneously signed on that same date. I am persuaded by a preponderance of the evidence that this exchange of promises, and the simultaneous execution of both documents, was sufficient to establish a binding written contract, and that such contract operated to assign the ATG trademark to Plaintiff.

I conclude that that this is the plain meaning of the documents, and this construction of the two agreements is consistent with and corroborated by other evidence, including the conduct of the parties. Although it would have been preferable and certainly would have added clarity if there were a separate document specifically purporting to transfer the trademark, the agreement itself leaves the form of documentation required to effectuate transfer strictly within the control of the purchaser. Specifically, Section 3.2 entitled "Transfer of Assets" provides that the "Seller shall deliver to the Purchaser … assignments and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to the Purchaser's counsel." Alan Blau testified that he, as an officer of UBU/Elements, was satisfied at the time of the closing that the documents executed adequately reflected the assignment of ATG.

Further support for this conclusion comes from the fact that approximately two weeks before the APA and Shareholder Agreement were signed, Defendant Chambers convened a special meeting of Elements Personal Care, Inc., the closely held company that was trading under the ATG mark, for purposes of authorizing a sale. In minutes from that meeting dated November 12, 2011, there was a unanimous vote that Mr. Chambers and the only other

shareholder in the company, Arthur Sumrall, should sign the APA and sell its assets to the Plaintiff.  Ex. P–8.

On the same date that the APA was signed along with the Shareholder Agreement, Mr. Chambers signed an Application for a "Tax Clearance Certificate" with the Pennsylvania Department of Revenue showing that the assets of his corporation were being transferred.  Ex. P–7.  The record is also clear that after the Shareholder Agreement was signed, Plaintiff provided Mr. Chambers with business cards identifying him as a representative of UBU/Elements, and through a related entity provided him with health insurance, reimbursement for expenses, and a modest amount of compensation.  Ex. P–14–19, 41.  There are marketing materials, including Internet marketing, all of which were funded by Plaintiff and reflect that the product known as ATG was the property of Plaintiff.  Finally, and of critical importance to my analysis, Mr. Chambers, along with Plaintiff's other shareholders, certified to a third party interested in acquiring the company that Plaintiff owned the ATG trademark.  Specifically, in late January 2014, Plaintiff tendered to a company known as MGS04 Wellness, Inc. an "Acquisition and Licensing Agreement" representing that Plaintiff had "exclusive ownership and rights" to use the mark.  Ex. P–12.  The record thus shows that all the parties acted consistently before, during, and after the signing of the APA and Shareholder Agreement, in a way that shows that they all understood those documents to effect an assignment of the ATG mark from Defendants to Plaintiff.

### C.  Defendants' Defenses

Defendant Chambers asserts a number of defenses targeting the validity of these documents.  First, he contends that the version of the APA that Plaintiff submits is fraudulent, and that he actually signed a document with a different first page.  It appears that there are at

least two versions of the APA, one that appears to be an initial draft, and one that appears to be a final signed copy.  Defendants are correct that there are differences in the two versions, both of which appear to be signed, but such differences are not material to this dispute.  In paragraph 1.1, which is entitled "Agreement to Sell," the parties agreed that "at the Closing (hereinafter defined), the Seller shall sell, grant, convey, transfer, assign and deliver to the Purchaser … all of the following: … All intellectual property registered or used by the Seller [Elements Personal Care, Inc.] or its principal Warren Chambers, which includes but is not limited to: patents, trademarks, copyrights and formulas for the following items:  i) After the Game."  Ex. 4 to Defs.' Resp. to Mot. for TRO at ¶ 1.1; Ex. P-5 at ¶ 1.1.  This language, which is the relevant and controlling language for purposes of this dispute, appeared in both the draft and final agreements.  For that reason, I reject Defendants' contention that there are fatal inconsistencies between the two versions.

Second, Mr. Chambers argues that the APA represents nothing more than an agreement to transfer ownership of the mark at some future point, specifically a "closing," an event that never took place.  To buttress this argument, he further argues that there was a side agreement that he was to be paid a certain monthly income, and that he refused to proceed to a closing and to transfer ownership of the mark because Plaintiff was unable to meet this condition.  I reject this position as not credible based upon the evidence of record.  The most telling fact is that the APA specifically linked the transfer of UBU/Elements shares to Defendants, accomplished through execution of the Shareholder Agreement, to completion of the transaction.  Ex. P–5 at ¶ 3.3.  In simple terms, that agreement would not have been executed, and Mr. Chambers would not have acquired an ownership interest in Plaintiff, unless the deal contemplated by the parties was consummated.  Acquisition of that ownership interest *was* the consideration for the

agreement, which encompassed assignment of all intellectual property, including the ATG trademark.  In the absence of such a transfer, the Shareholder Agreement would never have been signed.  Mr. Chambers is correct that the contract contemplated a closing date of November 8, 2011, and that the contract further provided that the closing date could only be amended in writing.  I do not, however, find this procedural violation dispositive, and I specifically credit the testimony of Mr. Blau that the "closing" was one contemporaneous event on November 23, 2011, at which time the shareholders signed the final APA and the Shareholder Agreement.

Mr. Chambers also argues that the parties had an agreement that he would continue to sell products to the customers he had acquired before forming UBU/Elements, and this is inconsistent with an intent to assign the mark.  I credit Mr. Blau's testimony that while Plaintiff agreed to allow Mr. Chambers to continue personally selling to existing customers, the parties agreed that all revenue from new accounts generated after execution of the APA would belong to Plaintiff.  I interpret paragraph 4.7(c) in the APA, wherein Defendants represented that he had no pre-existing agreements to sell products "after the Closing Date *with the exception of After the Game*," to corroborate this testimony.  Ex. P–5 at ¶ 4.7(c) (emphasis added).  The fact that the agreement provided a limited license carve-out to allow Defendants to profit from use of the trademark apart from UBU/Elements is not fatally inconsistent with assignment of the mark.

Defendants further contend that the corporation which owned the trademark before its transfer to Plaintiff, Elements Personal Care, Inc., lacked the capacity to assign it, because Mr. Chambers owned it personally.  This objection is answered by the fact that the Asset Purchase Agreement specifically encompassed intellectual property owned by Mr. Chambers personally, and the shareholders of Elements Personal Care, Inc. specifically authorized its transfer.  *See* Ex. P–5 at ¶ 1.1(c).  In that regard, it is noteworthy that the only two shareholders of Elements

8

Personal Care—Defendant Chambers and Arthur Sumrall—both became shareholders in the new entity.

Defendants also seem to argue that they did not have the authority to assign the ATG mark because they were already party to a licensing agreement that restricted its transfer. In 2002, well before Mr. Chambers entered into the agreements which are the subject of this dispute, he had entered into a Trademark License Agreement with PQ Corporation, an entity that supplies magnesium crystals. Ex. D-2. As part of that agreement, Mr. Chambers acquired a nontransferable right to use an additional trademark, "Go Soak Yourself." Defendants attempt to argue that this earlier licensing agreement prohibits assignment of the ATG mark because the two brands are linked together "in the market." This argument is patently lacking in merit. The 2002 agreement between Mr. Chambers and PQ Corporation makes no mention whatsoever of the ATG trademark. To the extent that Plaintiff's marketing of ATG has in some instances also used the mark "Go Soak Yourself," it might be that PQ Corporation has a claim against Plaintiff for trademark infringement. In no respect, however, does the 2002 agreement encumber the ATG mark.

Mr. Chambers further points out that the compensation that he received was not directly from Plaintiff UBU/Elements, Inc., but rather from a related company UBU Clothing. I find this immaterial. The record is clear that the intent of the parties was to add Mr. Chambers' magnesium sulfate products as a product line to an existing business already being operated by Mr. Chambers' new associates. The fact that his compensation was nominally from that related entity is inconsequential. In the world of closely held that businesses, practicality often trumps formality. The record is clear that Mr. Blau's existing business was expanding to encompass at least this new product line. Given that the existing business had established accounts, banking

relationships, and credit lines, it is hardly surprising that Mr. Blau made use of such facilities in the early stages of the parties' new venture. On a related note, Defendants suggest that the acquiring shareholders Mr. Blau and Mr. Koral breached their obligation to capitalize the new entity, because they make contributions through tax credits from their existing ventures. Once again, in the universe of small businesses, this would elevate form over substance. Such tax credits were for all practical purposes the equivalent of cash. The same analysis would apply to Defendants' argument that shares in the new corporation were never issued. I am persuaded by the testimony of Mr. Blau that the stock certificates themselves were held by counsel, as is frequently the case in transactions involving closely held businesses where the principals have a pre-existing personal relationship.

Defendants allege other "irregularities" in the conduct of the business, presumably to convince the Court that the combined Asset Purchase Agreement and Shareholder Agreement should not be enforced. For example, Mr. Chambers is listed as President of UBU/Elements in certain tax filings when in fact he did not hold such a position. I find such bookkeeping inconsistencies irrelevant to the question of who owns and has the right to trade under the two trademarks at issue here. In similar fashion, in order to sustain UBU/Elements in its early years of operation, it is clear that UBU Clothing was advancing and covering various expenses on its behalf. Keeping in mind the realities of small business, I find nothing sinister or fraudulent in that regard. Those same corporate records demonstrate that Mr. Chambers was receiving compensation and reimbursement for his efforts to market Plaintiff's line of products.

In sum, while Defendants present evidence that may explain Mr. Chambers' discontent with the bargain he struck in relinquishing ownership of the ATG mark in exchange for

participation in this new entity, that does not change the fact that he did transfer this asset to Plaintiff.

### D. Evidence that Defendants Engaged in Infringing Use of the Marks

With respect to the product Magsoothium, at the initial hearing held on June 7, 2016, Mr. Chambers conceded that he had no claim to that mark. He further represented to the court that he had not traded under that product name, and had no intention of doing so. It was therefore with some concern and regret that I heard evidence at the second hearing on this matter held on July 28, 2016 that Mr. Chambers had in fact sold products under this trade name on his own account. I find that this tends to lessen his credibility as to other material issues in the case.

With respect to ATG, there is also clear evidence of record that Mr. Chambers has engaged in unauthorized sales. Both Mr. Chambers and Mr. Blau testified that Defendants were already selling products under the ATG mark before the parties decided to form the new entity— UBU/Elements— to market these goods; therefore, the parties had an understanding that Mr. Chambers could continue to sell ATG to his pre-existing customers and keep *that* profit for himself. Evidently, however, Mr. Chambers has ignored the boundaries of this limited license and sold magnesium-based products bearing the ATG mark to newly acquired clients for the last several years without passing along this revenue to Plaintiff. Plaintiff presented evidence that certain distributors obtained products directly from Mr. Chambers, resulting in no profit to Plaintiff from these sales. Ex. P–55. Defendants also clearly admitted in a cease and desist letter sent to Plaintiff that Mr. Chambers has continuously used the ATG mark to advertise and sell products on his own from 2002 until the date of that letter, February 4, 2016. Ex. P–54.

In sum, Defendants cannot credibly assert that they have not engaged in use of the marks; the only point of contention is a legal question as to ownership and licensing, and for the reasons

discussed above, Defendants relinquished their right to sell to new customers using these marks upon executing the APA and Shareholder Agreement.

### III.     Balancing the Remaining Preliminary Injunction Factors

Courts considering the grant of a preliminary injunction must also consider the likelihood of irreparable harm in the absence of temporary relief, as well as balance the interest of the public and any potential harm to the party opposing the injunction. *Ferring Pharms.*, 765 F.3d at 210.

The evidence is sufficient to establish a likelihood of irreparable harm. "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990). A trademark owner's lack of ability to control the quality and reputation of the products associated with his mark is potentially damaging. *Id.* Plaintiff presented evidence that Mr. Chambers contacted one of its top customers claiming that Plaintiff "pirated" his formulas and sold them as "knock off[s]." Ex. P–20. At least one other customer contacted Plaintiff requesting products that he purchased through Mr. Chambers. Ex. P–55. As discussed in detail at the TRO hearing, Defendants have also sold both products using labels that Plaintiff had previously produced but then decided was unacceptable for use on its products. This confusion in the marketplace demonstrates the harm necessary to justify injunctive relief.

This confusion is also damaging to the public. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n.*, 920 F.2d at 197. Having found that there has been actual customer confusion about the source of ATG and Magsoothium products, it follows that there is a public interest in enjoining infringing use of the marks to prevent further confusion.

This interest is not outweighed by the potential harm to Defendants.  From a general review of the testimony in this case, it appears to me that all of the principals undertook this venture with expectations of a greater degree of market and financial success than has proven to be the case.  Because this product line has been Mr. Chambers' principal source of income for himself and his family, these setbacks have given rise to some degree of financial desperation.  At various junctures during the initial hearing on June 7, 2016, Mr. Chambers appeared to be invoking a right of "self-help," to make up for the disappointing performance of the new venture.  Although I sympathize with Mr. Chambers' dilemma, and recognize that he has faced particular personal challenges by virtue of two separate battles with cancer, it remains the case that parties must abide by the agreements into which they enter.  As I communicated to the parties at argument, I also regret the breakdown in a personal friendship that spanned decades.  Nonetheless, if Plaintiff is able to profit through sales of the products and thereby make any distributions to its shareholders, then Defendants can expect to benefit as contemplated in the APA.  Therefore, the risk of harm to Defendants by prohibiting sales of infringing products does not outweigh the risk of harm to Plaintiff, and Plaintiff has met its burden to prove its claims merit preliminary injunctive relief.  An appropriate Preliminary Injunction Order follows.

    /s/ Gerald Austin McHugh

United States District Judge